Miltom" Alpebt, J.
Claimant contracted with the State, through the Department of Transportation, to construct a portion of the Interstate Highway System known as the Northway. The portion of the highway to be so constructed by the claimant was located in Warren County and was that portion that ran between the Lake George interchange and Diamond Point Road. The project was identified as F.A. Project No. 1-87-3(59) and claimant’s contract was No. F.I.S.H. 64-15. In addition, claimant contracted for the reconstruction of a portion of the Lake George-Warrensburg Highway No. 5227, identified as F.A. Project No. F-490(8) and claimant’s contract was No. F.A.R.C. 64-14.
The contracts were approved by the State Comptroller on March 23,1964 and were to be completed on or before December 1, 1965.
Among the contract requirements were topsoiling and seeding of designated areas — the contract, as awarded, called for 8,250 cubic yards of topsoil to be provided, spread and seeded.
Claimant entered into the performance of the contract in the spring of 1964. The work proceeded during 1964 and was continued in the spring of 1965, after the shutdown for the winter 196A-1965.
In May of 1965, representatives of the State discussed with representatives of the claimant the possibility that additional topsoil would be required for the project. In the latter part of June of 1965 the necessity for the same became clear and, by Change Order No. 14 dated August 4, 1965 and received by the claimant on August 16, 1965, 18,000' additional cubic yards of topsoil were ordered “ Furnished and Placed.”
In the late summer of 1965 and into the early fall of 1965 claimant was delayed by reason of a two-week strike against its subcontractor engaged in the paving portion of claimant’s contract and also by adverse weather conditions. (See claimant’s Exhibit No. 7 in evidence, wherein claimant’s requested extension of time for completion to July 1, 1966 was granted.)
In late August of 1965 the State began conducting its tests to determine the areas where the additional topsoil should be placed. *359 This testing of soil was to be for the purpose of determining whether the original soil at the particular site would support a growth of grass or whether topsoil would be required so that grass could be grown. Such testing was to be at various locations along the route of the work. According to the State’s records, the last soil testing took place on November 2, 1965. As the tests proceeded, claimant procured the topsoil and dumped it on site during October and early November. The total topsoil on November 20, 1965 was estimated by a representative of the State at 39,000 cubic yards and later revised to 37,302 cubic yards; this was an overrun of the original contract amount by 29,052 cubic yards — an increase of almost 400%. It is noted that the 37,302-cubic-yard figure was over 10,000 cubic yards above what had then been formally ordered by the State in the original contract (8,250) and by Change Order No. 14 (18,000).
As a matter of fact, it was not until July 25, 1966 that by Change Order No. 18 an additional 10,000 cubic yards of topsoil were ordered ‘1 Furnished and Placed ’ ’ and ‘1 Seeding ” of an additional 42 acres was ordered by the State. It was generally agreed that this Change Order was confirmatory in nature.
By letter dated September 15,1965 the State advised claimant that the sealing of the stabilized shoulders would not be allowed until all work, except seeding adjacent to the area to be sealed, was completed. Such sealing, therefore, could not be performed until the topsoil dumping and spreading and guardrail work was completed. This was a change in claimant’s plan for the work, as it changed the time sequence in which claimant, with the State’s approval, had projected its work schedules so as to complete all of the work by December 1, 1965. Claimant was, by this September 15, 1965 directive of the State, obligated to withhold doing a portion of its work until almost the very end of its contract. By its original plan, this work was to be done earlier in the job; i.e., before October 15, 1965. In fact in “Public Works Specifications of January 2, 1962”, page 424, it is provided that Item 59W — Bituminous Stabilized Course (Including Shoulders) — may not be “ placed from October 15 to May 15, nor when the air temperature in the shade is below 50°F.”
Faced with such revision of scheduling, delays by the State, extra work required by the State, with the impossibility of completing the sealing work before October 15, as required by the State’s specifications, and with the approach of winter during which spreading and seeding of topsoil could not be done (note that this is in the Lake George-Adirondack Mountains area), claimant on November 15,1965 sought an extension of time under *360 the contract until July 1, 1966 and was granted such extension, with engineering and inspection charges assessed after June 15,1966. On May 25,1966, an additional extension to September 1, 1966 was sought and granted, extending the contract, however, only to August 1, 1966, with the same engineering and inspection assessment date as the first extension. On July 19, 1966 a third extension to September 1, 1966 was requested and granted with the original June 15, 1966 assessment date being continued.
The additional topsoil requirements commencing with order on contract No. 14 dated August 4, 1965 for 18,000 more cubic yards, and further directions in the fall of 1965 which were confirmed by order on contract No. 18 dated July 25, 1966 for a further 10,000 cubic yards, required claimant to go over the winter, as the topsoil could not be spread and seeded so late in the year even though the topsoil had been dumped on site in late fall of 1965.
In accordance with claimant’s Exhibit No. 6 in evidence, claimant was to do the topsoil, seeding and clean-up work between August 15, 1965 and December 1, 1965, which latter date was to be the end of the contract work. Yet, how could this be accomplished (a) if the State on September 15,1965 changed the order of the work concerning the sealing of the stabilized shoulders and, in effect, prevented the work to be done before October 15, 1965 as required by the State’s specifications, (b) if the State at that time did not know where and how much topsoil it required and was still testing for topsoil locations as late as November 2, 1965, and (c) where the State increased its topsoil requirements as it did, formally and informally, during the late summer and fall of 1965 from 8,250 cubic yards to a total of about 37,000 cubic yards during the time claimant had planned to complete its topsoil and all other work?
The State’s soil testing, the court finds occurred too late in the year, because the claimant was obligated by its progress schedule to complete all of the topsoil, seeding and cleanup work by the end of November, 1965. By delaying its tests and as the result thereof delaying the determination of where and in what amounts topsoil would he required, the State in effect forced claimant into a situation where there was no choice hut to postpone finishing of the work to the spring and summer of 1966.
Clearly, the claimant could not finish in 1965, as it planned to do, because of the above-described interfering and delaying actions of the State. Then, in 1966, work that was carried over had to be done. As contemplated by the revised schedule for the progress of the work in 1966 the' topsoil work, according to *361 the testimony at the trial, was completed before July 1, 1966. However, there was still work that had to be done after that, in accordance with the procedure and precedence of work required by the State’s directive of September 15, 1965. (See State’s Exhibit U in evidence concerning work to be done after July 1, 1966, on the borrow pits, sealing shoulders, cleanup, and punch list.) It is noted, for example, that the guardrail work, as shown in claimant’s Exhibit No. 6 in evidence, was expected to take two months and this work could not be done until the topsoil was completed because prior erection of guardrails would prevent grading equipment from entering onto the areas where topsoil was to be placed and spread. (This guardrail work was later scheduled in State’s Exhibit IT in evidence to be done during June and early July.) Also, the stabilized shoulder sealing and the clean-up work had to be done after the topsoil work was completed. (These were scheduled in State’s Exhibit H in evidence to be done during July to August 15, 1966.) Thus, the claimant had to do work under the contract during the July-August 1966 period because of the chain reaction effects of the State’s September 15, 1965 directive and the delayed topsoil orders and soil testing work of the State, as described above. Accordingly, it is clear to the court that the claimant was on the job from the period June 15,1966 to the end of the work because of the interfering effects of the State’s September 15,1965 directive, the State’s delayed timing of its increased topsoil orders, and the delays caused by the late testing of topsoil by the State which involved orders as to where topsoil was to be placed and thereafter spread and seeded.
Because of the interference and delays thus occasioned, claimant has brought this claim for damages for expenses incurred by it in additional overhead in the field and at its home office and also for the return of engineering and inspection charges made by the State. Claimant completed its contract on August 20,1966 and seeks damages (a) for the former category from July 1, 1966, the date claimant alleges it would have completed the contract, to August 20, 1966, the date of actual completion, and (b) for the latter category from June 15, 1966. The contract was accepted by the State on September 13, 1966 and the final estimate by the State was dated January 17, 1967. The claim was duly filed on April 18,1967, within six months of the date of the final estimate, and has not been assigned or submitted to any other court or tribunal for determination.
In submitting its original bid, claimant was asked to provide a “unit bid ” price for topsoil, and provided one at the rate *362 of $4 per cubic yard. Claimant was paid for the overrun of topsoil at this rate.
Ordinarily, delays in contracts are compensated for by an extension of time for completion. Such extensions are granted when the site availability is delayed or there is interference between a contractor and other contractors or utility owners (claimant’s Exhibit No. 2 in evidence, “ Public Works Specifications of January 2, 1962 ”, at page 54). For delay to be actionable, it must be more than ordinary delay; it must be “ extraordinary ” and not reasonably to be contemplated by the parties (Forest Elec. Corp. v. State of New York, 30 A D 2d 905; Norelli & Oliver Constr. Co. v. State of New York, 30 A D 2d 992).
During the course of the work claimant received three orders on contract increasing the work and a direction to alter its plan of construction work progress by doing the stabilized shoulder sealing after all work had been completed, except seeding. The increase in the amount of topsoil required by the State was far more than the parties reasonably could have contemplated at the origination of the contract, and the direction by the State’s representative on September 15, 1965, concerning the shoulder sealing, altered the critical path of the work as planned by the claimant and as theretofore approved by the State.
The orders on contract were as follows:
1. No. 14 dated August 4,1965 increasing the work by $89,500.
2. No. 16 dated September 30, 1965 increasing the work by $30,510.
3. No. 17 dated February 24, 1966 increasing the work by $29,149.
There was a fourth order on contract —
No. 18 dated July 25, 1966 increasing the work by $90,887.50. As noted above, this order was confirmatory in nature as by then practically all of the work was completed.
An overrun of several thousand yards of topsoil reasonably could have been contemplated by the parties and provided for in the unit price. But an overrun tif the proportion encountered in the instant case —almost 400% inore than the amount of topsoil originally contemplated — ordered as it was in August and later of 1965, and requiring claimant to withhold sealing of the stabilized shoulders until all work (except seeding) adjacent to the area to be sealed was completed, in the court’s opinion, is the cause of a delay which is extraordinary and, accordingly, is actionable.
Claimant, by reason of the State’s direction to withhold sealing the stabilized shoulders until all else, except seeding, was *363 completed, was obliged to alter and change its plans for progressing the project and completing it.
Claimant’s original job plan called for all the work being completed within the contract’s provisions as to dates. However, the State’s determination, late in the summer of 1965, that additional topsoil would be needed, its delay in testing to determine where such topsoil should be placed, and its directive of September 15,1965 relative to the sealing of the stabilized shoulders and resultant alteration of the work progression combined to force the claimant to seek extensions of the contract into 1966, with resultant higher administrative costs to claimant.
The court, therefore, holds that the changes in the contract by the State were qualitative as well as quantitative. For the latter, claimant has been properly paid at the unit-bid price of $4 per cubic yard. But, by reason of the critical-path changes and the active interference and delays by the State, as heretofore set forth, claimant has suffered damages.
The court finds that the $4 per cubic yard unit price for topsoil included in claimant’s bid and in the resultant contract did not include a factor for office overhead and administration which is the subject of this claim. The court notes that the 8,250 originally estimated cubic yards of topsoil to be required were not a firm amount, but rather an estimated amount which the representative of the consulting engineers of the State testified might or might not be used depending upon results of soil tests to be made on site. Furthermore, we have here a contract involving some six million dollars. It does not appear to the court that the claimant under these circumstances should reasonably be expected to have included an item for office overhead and administration in its $4 per cubic yard unit price, involving as it did a possible total of only $33,000 out of six million dollars or an indefinite additional amount if more topsoil were required at the unit price. This was a slender reed upon which to rely for a portion of office overhead and administration costs.
Claimant was required to keep its field office personnel on the job past the July 1, 1966 contemplated date of completion and was also required to incur additional home office expense as a result of the State’s actions.
The State has audited the claimant’s claim for additional overhead for the period July 1, 1966 to August 20, 1966. The verified sum of additional expense was $16,175. To this sum is added 15%, as permitted by the contract, as the allowance for overhead and profit. This computes to $2,426.25, making a total damage in the sum of $18,602.80.
*364 Claimant in its claim made an additional claim for the return of $8,426.44 charged against the claimant for engineering and inspection charges claimed to have been incurred by the State from June 15, 1966 to August 16, 1966, the final date of the contract completion. The court has considered the extenuating circumstances surrounding the contract changes and the extensions of time granted as a result of the State’s actions, and finds that this item of engineering and inspection charges was directly affected by the delays encountered in the topsoil requirement changes and the change of order of work for the stabilized shoulder sealing. The court finds that the claimant is entitled to a .return of this $8,426.44 item charged against it.
The total of the damages incurred and the return of the engineering and inspection back charge is $27,029.24.
Claimant is entitled to an award against the State in the sum of $27,029.24, with interest thereon from 90 days after the date of acceptance of the contract, which acceptance occurred on September 13,1966.
The motions made by the State at the conclusion of the claimant’s case, and renewed at the end of the trial, to dismiss the claim for failure to prove a prima facie case and for failure to prove damages, are now denied.